Joseph G. Sansone
Chief, Market Abuse Unit
Simona K. Suh
Tracy Sivitz
Chevon Walker
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0029 (Sivitz)
sivitzt@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                            Plaintiff,<br><br>          -against-<br><br>SETH MARKIN and BRANDON WONG,<br><br>                            Defendants. | COMPLAINT<br><br>1:22-cv-06276<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Seth Markin ("Markin") and Brandon Wong ("Wong"), alleges as follows:

**SUMMARY**

1. This case involves insider trading by Markin and his close friend Wong in the securities of Pandion Therapeutics, Inc. ("Pandion"), in advance of the February 25, 2021 announcement of a tender offer by Merck & Co., Inc. ("Merck") to acquire Pandion (the "Announcement").

2. During approximately three and a half weeks leading up to the Announcement, Markin misappropriated material nonpublic information about Merck's planned tender offer for Pandion (the "Merck-Pandion Deal") from his romantic partner, an associate at a major law firm

(the "Law Firm") that represented Merck in the Merck-Pandion Deal (the "Associate"). While the Associate worked on the Merck-Pandion Deal, Markin often stayed for multiple days at a time at the Associate's apartment. The Associate worked on the deal and engaged in frequent telephone calls regarding the deal from her apartment. In breach of his duty of trust and confidence to the Associate, Markin used the information he obtained while staying in the Associate's apartment to purchase Pandion stock ahead of the Announcement.

3. Markin also tipped this material nonpublic information to his close friend Wong, who then similarly purchased Pandion stock ahead of the Announcement.

4. When Pandion's stock price increased by over 133% on the day of the Announcement, Markin and Wong reaped ill-gotten gains of over $82,000 and $1.3 million, respectively. As he had promised Markin before the Announcement, as a thank-you for the tip, Wong later bought Markin a luxury watch. Wong also paid for some of Markin's expenses on a Hawaiian vacation that the Defendants took together after the Announcement.

**VIOLATIONS**

5. By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Exchange Act Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

6. Unless Defendants are restrained and enjoined, Defendants will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21A(a) [15 U.S.C. § 78u-1(a)].

8. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to pay disgorgement and prejudgment interest pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

10. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

11. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. At all relevant times, Wong was a resident of New York, New York. Further, at all relevant times, common stock of Pandion traded publicly on The Nasdaq Stock Market, which is headquartered in New York, New York.

**DEFENDANTS**

12.     **Markin**, age 31, is a resident of Washington Crossing, Pennsylvania, and was formerly in new agent training for the Federal Bureau of Investigation. During the insider trading alleged in this complaint, Markin was employed by a federal contractor as a compliance analyst.

13.     **Wong**, age 38, is a resident of New York, New York, and Markin's close friend. During the insider trading alleged in this complaint, Wong was employed by a tutoring company in a technical support role.

**RELEVANT ENTITIES**

14.     **Pandion** at all relevant times was a Delaware corporation with headquarters in Cambridge, Massachusetts. Pandion was a clinical-stage biopharmaceutical company that developed therapeutics for patients with autoimmune diseases. Prior to the completion of Merck's acquisition of Pandion in April 2021, Pandion's common stock was listed on The Nasdaq Global Select Market under the symbol PAND.

15.     **Merck** is a New Jersey corporation with headquarters in Kenilworth, New Jersey, and with common stock listed on the New York Stock Exchange. It is a global health care company with products that include prescription medicines, vaccines, biologic therapies, and animal health products.

# FACTS

## I. MERCK TOOK SUBSTANTIAL STEPS TO ACQUIRE PANDION BY TENDER OFFER

16. Beginning in August of 2020, representatives of Merck and Pandion began meeting to discuss updates to Pandion's drug developments and to facilitate due diligence by Merck of Pandion pursuant to the parties' confidentiality agreement. In September 2020, executives at both companies met to discuss working together on advancing Pandion's products, culminating in an unaccepted proposal by Merck in October 2020 for a possible partnership agreement between the companies.

17. From November 2020 through January 2021, Merck continued its due diligence of Pandion, including accessing Pandion's virtual data room containing regulatory submissions and related information. By at least January 25, 2021, Merck had retained the Law Firm as counsel to represent Merck in developing and implementing its plan to acquire Pandion.

18. On or about February 5, 2021, Merck engaged an investment bank to provide investment banking services in anticipation of a potential deal with Pandion.

19. On or about February 7, 2021, Merck submitted a proposal to Pandion to acquire all of its common stock.

20. On or about February 9, 2021, Merck and Pandion reached agreement on a proposed acquisition price for Pandion's common stock of $60 per share.

21. Also on or about February 9, 2021, Merck provided Pandion with an initial draft of a merger agreement, under which Merck would acquire Pandion's shares of common stock by tender offer.

## II. MARKIN MISAPPROPRIATED MATERIAL NONPUBLIC INFORMATION FROM THE ASSOCIATE

22. Beginning in or about October 2020 and through approximately May 2021 except for a few days in January 2021, Markin was in a close romantic relationship with the Associate. Throughout their relationship, Markin often stayed at the Associate's apartment for extended periods of time during January and February 2021.

23. Because of the global pandemic, Markin and the Associate frequently worked from the Associate's apartment during their relationship.

24. During their relationship, Markin and the Associate shared confidences, including discussions about each other's families and plans of marriage.

25. As part of his relationship with the Associate, Markin agreed, expressly or by implication, to treat information related to the Associate's work as confidential and not to trade on it, use it for personal benefit, or share it with others.

26. Markin also knew, was reckless in not knowing, or consciously avoided knowing that, based on their history, pattern, or practice of sharing confidences, the Associate expected that Markin would maintain the confidentiality of information related to the Associate's work, and not trade on it, use it for personal benefit, or share it with others.

27. On or about January 31, 2021, the Associate joined the Law Firm's team of attorneys representing Merck on the Merck-Pandion Deal and became aware of Merck's efforts to acquire Pandion. The Associate continued working on the Merck-Pandion Deal through and beyond the date of the Announcement.

28. The Associate frequently worked on the Merck-Pandion Deal from her apartment, where Markin was often staying, and she kept a binder of documents concerning the Merck-Pandion Deal in the apartment.

29. Among the documents included in the binder was a printed copy of an internal Law Firm email, dated January 31, 2021, which indicated that Merck was considering acquisition of Pandion and sought to move quickly. Additionally, the email disclosed a code name for the deal and stressed that the deal was "highly confidential" and that those working on the deal must be "extremely careful" not to disclose information associated with the deal.

30. Starting on or before February 1, 2021, and continuing in the days leading up to the Announcement, Markin misappropriated material nonpublic information about the Merck-Pandion Deal from the Associate, including that Merck planned to acquire Pandion, the target date when the acquisition would be publicly announced, and an estimated share price for the acquisition.

31. While working from home in January and February 2021, the Associate conducted work-related telephone calls, including on the Merck-Pandion Deal, from the Associate's one-bedroom apartment. At times, Markin was present in the Associate's apartment when the Associate conducted such work-related calls.

32. Additionally, on multiple occasions in or about January and February 2021, without the Associate's consent and while she could not observe him, Markin reviewed the Associate's binder of documents concerning the Merck-Pandion Deal.

### III. MARKIN BOUGHT PANDION STOCK AHEAD OF THE ANNOUNCEMENT

33. On or about February 1, 2021, the day after the Associate was assigned to work on the Merck-Pandion Deal, Markin began purchasing shares of Pandion stock. Between February 1, 2021 and February 5, 2021, Markin purchased 823 shares of Pandion stock.

34. Between February 8, 2021 and February 19, 2021, Markin purchased 87 additional shares of Pandion stock.

35. On or about February 23, 2021, two days before the Announcement, Markin purchased 1,360 additional shares of Pandion stock.

36. Overall, between February 1 and 23, 2021, Markin accumulated a total position of 2,270 shares of Pandion stock. All of Markin's purchases were made after Merck took substantial steps to acquire Pandion by tender offer.

37. Markin knew, was reckless in not knowing, or consciously avoided knowing that the information he had when he made the purchases of Pandion stock alleged above was material and nonpublic.

38. Markin knew, was reckless in not knowing, or consciously avoided knowing that, by purchasing Pandion stock as alleged above, while in possession of, and on the basis of, material nonpublic information about the Merck-Pandion Deal, he breached his duty of trust and confidence to the Associate.

39. Markin also knew or had reason to know that the material nonpublic information about the Merck-Pandion Deal had been acquired directly or indirectly from an insider to the Merck-Pandion Deal negotiations – that is, from an employee or an agent of the target company, or the acquiring company, or an advisor acting on behalf of one of those companies in connection with the transaction.

**IV.   MARKIN TIPPED WONG, AND WONG BOUGHT PANDION STOCK AHEAD OF THE ANNOUNCEMENT**

40. At the time of Markin's tip to Wong, the two friends had known one another for about four years. Markin and Wong also sometimes traveled together.

41. In or about February 2021, Markin tipped to Wong the material nonpublic information about the Merck-Pandion Deal that Markin had misappropriated from the Associate. The information he communicated to Wong included details about the nature of the transaction, the target date for the Announcement, and the expected transaction price.

42. Additionally, Markin told Wong that Markin had learned the information about the Merck-Pandion Deal by secretly reviewing his romantic partner's work-related binder, without her

8

knowledge or consent. Through his friendship with Markin, Wong also knew that the Associate was Markin's romantic partner, and knew that the Associate was an attorney who was working on the Merck-Pandion deal team.

43. Markin and Wong primarily used an encrypted messaging application to communicate about Pandion. Markin and Wong would often use a disappearing message setting to delete messages about Pandion, and Wong also sometimes manually deleted them.

44. On or about February 10, 2021, Wong purchased 5,500 shares of Pandion stock. Wong continued to purchase Pandion stock between February 11, 2021 and February 24, 2021, amassing a total position of 35,382 shares. All of Wong's purchases were made after Merck took substantial steps to acquire Pandion by tender offer.

45. Wong purchased Pandion stock as alleged above while in possession of, and on the basis of, material nonpublic information about the Merck-Pandion Deal tipped to him by Markin.

46. Markin obtained personal benefits from communicating this information to Wong, including the benefit of making a gift of material nonpublic information to a close friend, and a *quid pro quo* from Wong including the expectation of receiving a lavish thank-you gift.

47. Markin also expected that the information he communicated would be used for trading, and he knew, was reckless in not knowing, or consciously avoided knowing that Wong would use the tip to trade in Pandion securities.

48. Wong knew, was reckless in not knowing, or consciously avoided knowing that the information he received from Markin was material and nonpublic.

49. Wong also knew, was reckless in not knowing, or consciously avoided knowing that Markin provided him the material nonpublic information about the Merck-Pandion Deal in breach of a duty of trust and confidence and for personal benefit.

50.     Wong also knew, was reckless in not knowing, or consciously avoided knowing that the material nonpublic information about the Merck-Pandion Deal had been acquired directly or indirectly from an insider to the Merck-Pandion Deal negotiations – that is, from an employee or an agent of the target company, or the acquiring company, or an advisor to one of those companies in connection with the transaction.

## V.     MARKIN AND WONG TIPPED OTHERS

51.     In addition to Wong, Markin tipped material nonpublic information about the Merck-Pandion Deal that he had misappropriated from the Associate to additional individuals who purchased Pandion securities ahead of the Announcement.

52.     Markin tipped these individuals in breach of Markin's duty of trust and confidence to the Associate; for a personal benefit, including the benefit of providing a gift to a relative or friend; with intent that these individuals trade on the information; and knew, was reckless in not knowing, or consciously avoided knowing that these individuals would in fact trade on the information.

53.     Wong unlawfully communicated the material nonpublic information he had received from Markin to individuals who also purchased Pandion securities ahead of the Announcement.

54.     Wong knew, was reckless in not knowing, or consciously avoided knowing that the successive tippees would trade based on the material nonpublic information that Wong unlawfully communicated to them.

## VI. THE ANNOUNCEMENT AND DEFENDANTS' ILL-GOTTEN GAINS

55. On February 25, 2021, before market open, Merck and Pandion announced that the companies had entered into a definitive agreement under which Merck would acquire Pandion. Under the agreement, Merck would initiate a tender offer to acquire all outstanding shares of Pandion for $60 per share. Pandion's stock price closed at $59.81 per share that day, an increase of $34.18 per share or over 133% from the previous day's close of $25.63 per share.

56. As a result of the price increase, Markin generated total ill-gotten gains of over $82,000 and Wong generated total ill-gotten gains of over $1.3 million.

57. After the Announcement, Wong bought Markin a Rolex watch to thank Markin for the tip and paid some of Markin's expenses on a vacation to Hawaii that Wong and Markin took together.

## FIRST CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

58. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 57.

59. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

60. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 14(e) and Rule 14e-3 Thereunder

61. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 57.

62. Between January 25, 2021 and February 24, 2021, Merck (the "offering person") took substantial steps to commence or did commence a tender offer for Pandion shares of stock but the proposed tender offer was not publicly announced during this time.

63. Between February 1, 2021 and February 24, 2021, Defendants possessed material nonpublic information from the Associate, an employee of Merck's counsel with respect to the tender offer, relating to the tender offer for Pandion; knew or had reason to know that this information was nonpublic; knew or had reason to know that this information was acquired directly or indirectly from (a) the offering person, (b) the issuer of the securities sought or to be sought by such tender offer, or (c) any officer, director, partner or employee or any other person acting on behalf of such offering person or such issuer; and purchased or sold, or caused to be purchased or sold, Pandion's securities; and/or communicated material nonpublic information relating to such tender offer to one or more other persons under circumstances in which it was reasonably foreseeable that such communication was likely to result in a violation of Exchange Act Rule 14e-3.

64. By reason of the foregoing, Defendants have violated and, unless enjoined, will again violate Exchange Act Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Exchange Act Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

**II.**

Ordering Defendants to disgorge all ill-gotten gains Defendants received as a result of the alleged violations with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering Defendants to pay civil monetary penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1];

**IV.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
July 25, 2022

/s/ Tracy Sivitz
_____
Tracy Sivitz
Joseph G. Sansone
Simona K. Suh
Chevon Walker
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0029 (Sivitz)
sivitzt@sec.gov